**UNITED STATES of America,
Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY,
Defendant.**

Civ. A. No. 4723.

United States District Court
D. South Carolina,
Greenville Division.

Feb. 18, 1966.

John C. Williams, U. S. Atty., Greenville, S. C., for plaintiff.

J. Wright Horton and F. Dean Rainey, Greenville, S. C., Paul C. Warnke and Duncan B. Phillips, Washington, D. C., for defendant.

HEMPHILL, District Judge.

Plaintiff United States seeks civil penalties against Southern Railway Company under the provisions of Section 1 (17) of the Interstate Commerce Act, 49 U.S.C. § 1(17). The Complaint charges that Southern violated Service Order No. 947[1] on twenty occasions between January 21 and March 1, 1964, in the vicinity of Greenville, South Carolina. Prayed for is the statutory maximum civil penalty of $500.00 for each violation alleged. Both parties have moved for Summary Judgment pursuant to Rule 56, Federal Rules of Civil Procedure.

The Complaint charges defendant's delay, in several instances, in handling cars for placement as treated by Paragraph (a) (1) (a) of the Service Order which provides that carriers will place inbound loaded cars on consignee's tracks within 24 hours after the first 7:00 A. M. o'clock, exclusive of Saturdays, Sundays and holidays. The remaining "charges" stem from alleged violations of Paragraph (a) (2) (a) of the order requiring removal of empty cars from the point of unloading within 24 hours after the first 7:00 A. M. o'clock, exclusive of Saturdays, Sundays, and holidays, following release by consignee or shipper.

---

1. Service Order No. 947, which will be more fully set out and discussed infra, see note 4, requires the railroads (a) to place promptly on consignee's tracks loaded freight cars after arrival at destination, and (b) to remove promptly all freight cars from consignee's tracks after release or tender by the consignee's or shippers, as the case may be.

The substance of Southern's defense, as revealed by its Answer, is that it denies the Interstate Commerce Commission had authority to issue Service Order No. 947, and that there was no "emergency" extent such as would give the I.C.C. authority to issue an "order" without notice and hearings required by 49 U.S.C. § 1(14) (a), which provides in part: "The Commission may, after hearing, * * * establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter * * *." The Government's counter-thrust to this defense is that order was generated by an "emergency" within the contemplation of 49 U.S.C. § 1(15) which allows the I.C.C. to make "directions" without regard to rules, regulations, or practices, and without holding hearings, when a genuine emergency exists. Further averred is that there is no authority in this Court, consisting of one judge, to enjoin the operation of the Order as a three-judge court is necessary as is provided by 28 U.S.C. § 2325, which requires that:

> An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or part, of any order of the Interstate Commerce Commission

shall not be granted unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

Southern also contends that Service Order No. 947 does not impose liability without fault, alleges that during the time in question full compliance was impossible.

I

The first issue revolves around the question of whether or not Service Order No. 947 is void because the hearings required by Section 1(14) of the Interstate Commerce Act were not held, and whether or not it is an "emergency direction" authorized by Section 1(15) thereof.

Jurisdiction in the I.C.C. to regulate car service is found in Sections 1(10) through (17) of the Interstate Commerce Act. Its sole authority to issue regulations is conferred by Section 1(14) (a) of the Act, 49 U.S.C. § 1(14) (a).[2] It is clear from the face of the Act that this authority can be exercised only after affected parties have had an opportunity to be heard. Under Section 1(15) of the Act, 49 U.S.C. § 1(15)[3], the I.C.C. has authority to utilize certain summary powers without notice or hearing.

**2.** Title 49 U.S.C. § 1(14) (a) provides: The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations, or practices.

**3.** The pertinent part of 49 U.S.C. § 1(15) provides: Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the Commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable * * *.

In Service Order No. 947 [4] it was announced that an emergency existed which required immediate action to alleviate an acute shortage of railway boxcars throughout the country. And, as is noted in note 4, Service Order No. 947 has been continued in force and effect with no substantial changes.

■ As was noted above, the extraordinary power to declare an emergency has a statutory basis. It is necessary that there be a real emergency, an actual emergency, or Congress would have used less restrictive language. The authority to issue emergency *directions*, as given in Section 1(15) was not designed to circumvent the regular rule-making power of the Commission given in Section 1 (14).

It is interesting to note in Service Order No. 947 the frequent repetition of words such as "regulations," "order," "rules," "practices," and "order and direction," all evincing the forceful mandate of the Commission. The language of Section 1(15) (b) gives the authority to "make * * * just and reasonable *directions,*" in an emergency. [Emphasis supplied.]

■ The notice and hearing required to protect the rights of all interested par-

---

4. Pertinent parts of Service Order No. 947 provide:

RAILROAD OPERATING REGULATIONS FOR FREIGHT CAR MOVEMENT

At a Session of the Interstate Commerce Commission, Division 3, held at its office in Washington, D.C., on the 7th day of November, A.D. 1963.

*It appearing,* That an acute shortage of freight cars exists in all sections of the country; that cars loaded and empty are unduly delayed in terminals and in placement at, or removal from industries; that present rules, regulations, and practices with respect to the use, supply, control, movement, distribution, exchange, interchange, and return of freight cars are insufficient to promote the most efficient utilization of cars; it is the opinion of the Commission that an emergency exists requiring immediate action to promote car service in the interest of the public and the commerce of the people. Accordingly, the Commission finds that notice and public procedure are impracticable and contrary to the public interest, and that good cause exists for making this order effective upon less than thirty days' notice.

*It is ordered,* That:

§ 95.947 *RAILROAD OPERATING REGULATIONS FOR FREIGHT CAR MOVEMENT.*

(a) Each common carrier by railroad subject to the Interstate Commerce Act shall observe, enforce and obey the following rules, regulations and practices with respect to its car service: * * *.

* * * * *

*It is further ordered,* That a copy of this order and direction shall be served upon the association of American Railroads, Car Service Division, as agent of the railroads subscribing to the car serv-

ice and per diem agreement under the terms of that agreement; and that notice of this order be given to the general public * * *.

* * * * *

[Amendment No. 2 which took effect upon the expiration of the original Service Order extended the time of its effectiveness from July 31, 1964 to December 31, 1964. It noted the *continuing* acute shortage of freight cars.]

Amendment No. 2, in part, provides:

RAILROAD OPERATING REGULATIONS FOR FREIGHT CAR MOVEMENT

At a Session of the Interstate Commerce Commission, Division 3, held at its office in Washington, D. C., on the 13th day of July, A.D. 1964.

Upon further consideration of Service Order No. 947 (28 F.R. 12127; 29 F.R. 6014) and:

*It appearing,* That an acute shortage of freight cars continues to exist in all sections of the country; that cars loaded and empty are unduly delayed in terminals and in placement at, or removal from industries; that present rules, regulations, and practices with respect to the use, supply, control, movement, distribution, exchange, interchange, and return of freight cars are insufficient to promote the most efficient utilization of cars; it is the opinion of the Commission that the continuance of the emergency requires the order of November 7, 1963, to remain in effect for an additional period of time to promote car service in the interest of the public and the commerce of the people.

*It is ordered,* That:

§ 95.947 *RAILROAD OPERATING REGULATIONS FOR FREIGHT CAR MOVEMENT,* of Service Order No. 947, be, and it is hereby amended. * * *.

ties cannot be lawfully bypassed by characterizing sweeping and continuing regulations and rules as "directions." The concurrent existence of the two sections discussed clearly shows the Congressional intent to confine narrowly the kind of emergency action the I.C.C. may take without following the normal regulatory procedure.

■ Service Order No. 947, on its face, shows that it exceeds the Commission's emergency powers. No attempt was made to mask the broad scope and effect of its regulatory action:

> Each common carrier by railroad subject to the Interstate Commerce Act shall observe, enforce, and obey the following rules, regulations and practices with respect to its car service * * *.

This sweeping pronouncement is entirely inconsistent with the concept of emergency "directions."

The legislative history of Section 1(15) shows that the authority to make "just and reasonable directions with respect to car service" without notice, hearing, or the making or filing of a report was designed to permit the I.C.C. to deal on a short-range basis with specific emergency problems. This power was thusly limited to avoid constitutional doubts. See, e. g., Hearings Before the House Committee on Interstate and Foreign Commerce, H.R. 19546, H.R. 20256, and H.R. 20352, 64 Cong., 2nd Sess. 26, 34–36 (1917); 55 Cong.Rec. 2022, 2025 (May 9, 1917); 55 Cong.Rec. 2631 (May 21, 1917). This stop-gap authority was not designed to substitute for considered solutions to continuing, albeit chronic, problems arrived at after full and fair hearings.

The Commission's assertion of its unfettered prerogative, absent fraud, wrongdoing or capriciousness, to perpetuate service orders on unreviewable findings of "legislative emergency," Cf., Daugherty Lumber Co. v. United States, 141 F.Supp. 576, 581 (D.Ore.1956, 3-judge court); 29A C.J.S. p. 143, is incompatible with the legislative history of Section 1(15).

When the first hearings were held on the bills which were the forerunners of the Esch Car Service Act of 1917, 40 Stat. 101, it was evident that the Commission itself recognized the limited realm of legality afforded by this legislation. Commissioner Hall, after telling the committee of Congress that this authority to promulgate orders without notice or an opportunity for hearing "would not be resorted to except in emergency," went on the record as saying that this limitation to emergency situations saved the legislation from constitutional doubt. In response to the specific question as to why the issuance of directions without notice would not be a deprivation of property without due process of law, Commissioner Hall replied:

> If it were anything else but an emergency, of course, the notice should and would be given. But to make clear what I may not have made clear—what is contemplated in a time of emergency is not the substituting of new rules for old. What is contemplated is the giving of specific directions as to specific things, right on the ground, as, for example, Chicago, if the situation is congested there. The Commission, through such agency as it may select for that purpose, says to one carrier "you take fifty empty cars and deliver them to that road; you take 100 empty cars, and deliver them to that other road. Hearings Before the House Committee on Interstate and Foreign Commerce on H.R. 19546, H.R. 20256, and H.R. 20352, 64 Cong. 2d Sess. 26, at 36 (1917).

Commissioner Hall analogized the I.C.C.'s function in a car shortage emergency to that of a policeman in a traffic jam. Subsequent Congressional consideration of car service legislation make it abundantly clear that the emergency power was intended to cover cases of actual emergency only. See 55 Cong.Rec. 2022–26, by Congressman Esch. F. B.

Dow, an attorney for the I.C.C., was asked by the Senate Committee why summary power to deal with car service should not be conferred generally on the I.C.C. instead of "introducing the uncertainty as to when or where there is an emergency or not." His reply was that the Commission should not be given such power without adequate provision for notice and hearing. His opinion was that it would normally be essential to afford a hearing, as proper car service rules are complicated matters requiring careful consideration. Hearings Before the Subcommittee of the Senate Committee on Interstate Commerce on § 636, 65 Cong. 1st Sess. 13 (1917) at 31. Nowhere in the voluminous legislative history is there any suggestion that this authority could be exercised in lieu of the regular rulemaking authority given by Section 1(14).

It is obvious that Service Order No. 947, as amended, sought to deal with a chronic problem, not an emergency. As counsel for the Commission noted in his argument[5]:

> I would like to make brief mention of a bit of the legislative history of this Section 1(15) of the Act. This Act, surprisingly enough, was passed after a period of a number of prolonged car shortages that began in about 1907 with the rising economy of the country and Mr. Esch was the author of the bill, called the Esch Car Service Act.

He pointed out further that the Commission had attempted to promulgate rules under Section 1(14) (a) in 1947, but for some reason, was unsuccessful.[6]

The upshot is that the Commission has declared an "emergency" because of its failure to have rules promulgated pursuant to Section 1(14) (a). Emergency procedures can properly be invoked only to deal with actual emergency circumstances. United States v. Southern Railway Co., Civil Action No. 1901 (M.D.Ga. 1964). As Mr. Justice Holmes noted:

"The statute confines the power of the Commission to emergencies * * *." Avent v. United States, 266 U.S. 127, 130, 45 S.Ct. 34, 35, 69 L.Ed. 202. See also In re Solar Manufacturing Corp., 176 F. 2d 493 (3rd Cir. 1949). The net effect of what has happened is that the Commission is attempting to treat a continuing, chronic problem which has existed since 1907, as an "emergency requiring immediate action."

It is obvious that the Congress did not intend that "emergency" findings would be used to perpetuate so-called "directions" which are, in fact, broad and pervasive rules reenacted perennially.

In United States v. Thompson, 58 F. Supp. 213 (E.D.Mo.1944), the I.C.C. brought an action for alleged violations of Service Order No. 178. Defendant moved to dismiss the Complaint on the ground that the service order was invalid. Judge Hulen held the service order invalid because it did not have a specified time of existence and was, in effect, permanent in character. Judge Hulen noted:

> Abstractly stated, section 1, paragraph 15, Title 49, U.S.C.A., gives to the Interstate Commerce Commission, unusual, drastic, and in some respects dictatorial powers. Powers of such character delegated to the Commission by this law can and should be exercised only on the basis that they are necessary to meet an emergency—an emergency that does not admit of time for notice and hearing to those whose property would be affected by the order. Consequently the requirement appears in the law, and in our opinion properly so, that the Commission must find the existence of an emergency as a foundation for the exercise of any of the emergency powers to be exercised under the act. It would seem to follow that orders under the powers thus delegated, being justified

---

5. Page 31, transcript of argument. See also Report No. 1553, to accompany H.R. 20352, 64th Cong. 2nd Sess. (1917), pp. 3–4.

6. Page 32, transcript of argument.

only because of the existence of an emergency, the continuance in effect of such orders can only be justified because of and so long as the emergency continues. Hence the provision in the law that the emergency order issued would be for such "period" as in the determination of the Commission would meet the emergency. There should be not only the relationship and consistency in the order of the finding of the existence of an emergency, as a basis for its original issuance, but the duration of the order should bear on its face a relationship and consistency with reasonable expectation, based on the judgment of the Commission, of the duration or "period" of continuance of the emergency. If the order is for a period that is limited, it bears that relationship and shows such a consideration and finding by the Commission. Conversely if the order is without a period and to run indefinitely, containing no reference to duration, such an order on its face is inconsistent with the continued existence of the emergency which brought it into existence and fails to show any consideration was given by the Commission to duration or "period" of the emergency. 58 F. Supp. at p. 216.

The Court did not consider this to be a mere technical objection.

It goes to a substantive right of the defendant—a right to be secure in its property and free from orders affecting the use that it may make of its property, without notice or hearing, unless the orders are required by a present emergency and then only during the continuance of the emergency, as the law has provided. 58 F.Supp. at p. 217.

The Commission relies upon Daugherty Lumber Co. v. United States, 141 F.Supp. 576 (D.Ore.1956), to support the service order as a proper exercise of its summary powers under Section 1(15). There a 3-judge court held that the Commission's opinion as to the existence of an emergency was controlling and that "emergency" should be viewed in a "legislative sense" rather than being given its normal meaning as an "unforseen combination of circumstances which calls for immediate action." 141 F.Supp. at p. 581.

*Daugherty* can be distinguished from the case at hand, as it involved only the validity of the initial determination of an emergency. It did not present, as does the matter at bar, the anomaly of a "chronic emergency," by which the I.C.C. seeks to justify a succession of orders, and amendments, without hearing, over a protracted period. Even if it would be agreed that the Commission has broad discretion initially to find an "emergency" requiring immediate action under Section 1(15), the perpetuation of such an order and its subsequent use as the basis for a penalty suit necessitates some inquiry by this Court, where enforcement is sought, into the existence of the "emergency" at the time of the alleged violation. Again quoting Mr. Justice Holmes in Chastleton Corp. v. Sinclair, 264 U.S. 543, 547, 548, 44 S.Ct. 405, 406, 68 L.Ed. 841:

> A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed.

A review of the legislative history of the Act, the remarks of counsel for the Commission,[7] and a reading of the Act itself compels a determination that the wrong sought to be remedied is just a chronic problem that has existed for over half a century. To call it an "emergency" within the contemplation of Section 1(15) by administrative decree at this stage is an abuse of the power given the Commission by Congress. This must be considered in the light of the Commission's attempt to invoke a forfeiture upon Southern for "delaying" during a time when it suffered two derailments.

7. See text accompanying notes 5 and 6, supra.

As Mr. Justice Goldberg said last term in One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 700, 85 S.Ct. 1246, 1250, 14 L.Ed.2d 170:

> * * * [A] forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law.

With this language in mind, viewing the facts conceded, abuse by the Commission becomes more obvious.

There is no question but that the end being sought by the I.C.C., increased utilization of box cars, is of great benefit to the country. However, the torturing of legislative language and intent, using forfeiture as a vehicle, is an unacceptable means. Cf., M'Culloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579, Marshall, C. J.

## II

The second issue involves the question of whether or not Southern can attack Service Order No. 947 in this Court.

█ The Commission says that Southern "has forfeited any right to place the validity of Service Order 947 in issue in this proceeding" and that "defendant may not collaterally attack a Commission Service Order in an enforcement proceeding." Insisted is that the validity and application of a service order, issued without benefit of hearing or notice, cannot be raised in defense of a penalty action.

At the outset it should be noted that plaintiff improperly characterizes Southern's defense as "collateral attack." The concept of collateral attack is meaningful where, in a judicial proceeding, one of the litigants attempts to impeach the validity of a judgment entered by another court in another judicial proceeding. E. g., Dodge v. Detroit Trust Co., 300 Mich. 575, 2 N.W.2d 509, 520. Here this concept has no place.

Nor does the fact that Section 1.101(3) of the General Rules of Practice of the Interstate Commerce Commission (49 C. F.R. § 1.101(3)) permits a petition for rehearing, reargument or reconsideration somehow detract from Southern's right to assert the defense of invalidity in this penalty proceeding. Here, moreover, the Government can hardly complain about the absence of a petition for rehearing or reargument when neither hearing nor argument were ever afforded and defendant's claim of invalidity derives from this absence of administrative due process.

█ The Commission contends that the question of the validity of Service Orders can be considered only by a three-judge court under 28 U.S.C. § 2325, but that section provides only that:

> An interlocutory or permanent injunction restraining ᵗ the enforcement, operation or execution, in whole or in part, of any order of the Interstate Commerce Commission shall not be granted unless the application therefore is heard and determined by a district court of three judges under section 2284 of this title.

The provision obviously has applicability only to a suit brought *against* the Interstate Commerce Commission seeking to enjoin enforcement of one of its orders. Neither in language nor in purpose does it preclude a defendant, in a penalty action, from questioning the validity or interpretation of the order on which the suit for penalties rests.

█ Title 28 U.S.C. § 2321 is similarly unavailing in the Commission's attempt to foreclose defense against its unjustified penalty action. It specifies:

> The procedure in the district courts in actions to enforce, suspend, enjoin, annul or set aside in whole or in part, any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures, shall be as provided in this chapter.

Obviously the Government does not contend that Section 2321 makes a three-

judge court the sole tribunal before which an action to enforce a Service Order may be brought. Section 2325 limits the mandatory three-judge court procedure to actions brought to enjoin I.C.C. orders. Inasmuch as this is not such an action, Section 2325 is not applicable.

■ The Government's contention that Southern is launching a "collateral attack" on the validity of a Service Order and that it may not do so was expressly rejected by Judge Elliott in United States v. Southern Ry. Co., Civil Action No. 1901 (M.D.Ga.1964).[8] That case involved an attempt by the Government to exact penalties for alleged violations of Second Revised Service Order 939. Defendant contested the validity of that Service Order in the penalty proceeding and its contentions were upheld. In accepting jurisdiction, Judge Elliott followed the line of precedent discussed in 3 Davis Administrative Law Treatise § 23.07.

"One of the most-used means of challenging administrative action is by resisting enforcement—by defending proceedings brought to enforce the administrative action. Most administrative action depends for enforcement, either immediately or ultimately, upon sanctions imposed by courts."

\* \* \* \* \* \*

"In general, a defendant in a civil or criminal proceeding brought to enforce an administrative order or regulation may defend on the ground of invalidity of the order or regulation in absence of affirmative legislative intent to the contrary. The natural assumption is that one may not be held civilly or criminally liable for violating an invalid order or regulation. The tradition is deeply imbedded that even statutes may be challenged by resisting enforcement."

Prior to Judge Elliott's decision, another district court had permitted a defendant successfully to challenge the validity of a Service Order. See United States v. Thompson, 58 F.Supp. 213 (E.D. Mo.1944), supra. In numerous proceedings the courts have construed and interpreted such orders.[9] It is inconceivable that a court would refuse to allow a defendant in a penalty proceeding brought by the Commission for violation of a Service Order the opportunity of presenting legal and constitutional objections to the order or of challenging its interpretation.

Defendant here is not seeking "an interlocutory or permanent injunction restraining the enforcement, operation or execution" of a Commission order, as provided for in Section 2325. Doubt might exist as to this Court's jurisdiction to entertain a counterclaim by Southern for such an injunction. There can, however, be no doubt of the Court's jurisdiction to consider Southern's defenses, interposed to resist the exaction of penalties.

---

8. This decision is presently on appeal to the Fifth Circuit Court of Appeals.

9. Compare Atlantic Coast Line R.R. v. United States, 112 F.Supp. 594, 125 Ct.Cl. 235, (Ct.Cl.1953), where the court held that the ICC Service Order in question, if intended to apply to the situation urged, would be invalid as beyond ICC authority. This conclusion was followed in Boston & Mo. R.R. v. United States, 169 F.Supp. 957, 958, 144 Ct.Cl. 803 (Ct.Cl.1959). In Western Md. Ry. v. Commodity Credit Corp., 154 F.Supp. 508, 511 (D.Md.1957), and Reading Co. v. Commodity Credit Corp., 159 F.Supp. 67, 70 (E.D.Pa.1958), rev'd on other grounds 289 F.2d 744 (3rd Cir. 1961), the courts, through primarily concerned with the interpretation of the Car Service Orders, nevertheless examined them as to their validity. See also, Baltimore & O.R.R. v. Lambert Run Coal Co., 267 F. 776 (4th Cir. 1920), cert. denied 254 U.S. 561, 41 S.Ct. 148, 65 L.Ed. 457, modified on other grounds, 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922), wherein the alleged invalidity of a Service Order was determined by a single district court judge whose determination of the Order's invalidity was reversed by the Fourth Circuit.

In this connection, the Supreme Court decisions interpreting a closely analogous provision of the United States Code are fatal to the Government's position.

Title 28 U.S.C. § 2282 provides:

An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

Both Sections 2282 and 2325 deal with the granting of "an interlocutory or permarent injunction restraining the enforcement, operation, or execution" of, respectively, Acts of Congress and orders of the Commission. Both provide that the "application therefor" must be "heard and determined by a district court of three judges under section 2284 * * *."

The Supreme Court had occasion to consider the effect of the former provision in Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435. Action was initiated by a deported alien seeking review of an order terminating his old age insurance benefits. The district court held that the section of the statute providing for termination of these benefits was unconstitutional because it deprived plaintiff of an accrued property right.

The Supreme Court held that, inasmuch as no injunction was sought, Section 2282 did not apply and a three-judge court was not necessary.

However, the action did no more. It did not seek affirmatively to interdict the operation of a statutory scheme. A judgment for appellee would not put the operation of a federal statute under the restraint of an equity decree; indeed, apart from its effect under the doctrine of *stare decisis,* it would have no other result than to require the payment of appellee's benefits. In these circumstances we think that what was said in International Ladies' Garment Workers Union v. Donnelly Garment Co., 304 U.S. 243, [58 S.Ct. 875, 82 L. Ed. 1316], where this Court dealt with an analogous situation, is controlling here:

"(The predecessor of § 2282) does not provide for a case where the validity of an act of Congress is merely drawn in question, albeit that question be decided, but only for a case where there is an application for an interlocutory or permanent injunction to restrain the enforcement of an act of Congress. * * * Had Congress intended the provision * * *, for three judges and direct appeal, to apply whenever a question of the validity of an act of Congress became involved, Congress would naturally have used the familiar phrase 'drawn in question' * * *." Id., 304 U.S. at 250, 58 S.Ct. at 879.

We hold that jurisdiction over the action was properly exercised by the District Court, and therefore reach the merits. 363 U.S. at 607–608, 80 S.Ct. at 1371.

More recently, in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644, the Supreme Court held for similar reasons that even an action for a declaratory judgment of unconstitutionality did not require the convening of a three-judge court, but could properly be tried before a single district judge. The court observed that no injunctive relief was sought and none was granted. The court stated:

The present action, which in form was for declaratory relief and which in its agreed substance did not contemplate injunctive relief, involves none of the dangers to which Congress was addressing itself. The relief sought and the order entered affected an Act of Congress in a totally noncoercive fashion. There was no interdiction of the operation at large

of the statute. It was declared unconstitutional, but without even an injunctive sanction against the application of the statute by the Government to Mendoza-Martinez. Pending review in the Court of Appeals and in this Court, the Government has been free to continue to apply the statute. That being the case, there is here no conflict with the purpose of Congress to provide for the convocation of a three-judge court whenever the operation of a statutory scheme may be immediately disrupted before a final judicial determination of the validity of the trial court's order can be obtained. Thus there was no reason whatever in this case to invoke the special and extraordinary procedure of a three-judge court.

Section 2325 has no wider applicability than Section 2282. Neither restricts the consideration of the validity of Government action to three-judge court proceedings.

In support of its argument that Southern cannot question the validity of Service Order 947 in this penalty proceeding, the Government relies principally on Yakus v. United States, 321 U.S. 414, 64 S. Ct. 660, 88 L.Ed. 834 and United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290. Professor Davis has described these two cases as the outstanding exceptions to the general rule that "one of the most-used means of challenging administrative action is by resisting enforcement—by defending proceedings brought to enforce the administrative action." [10]

In Yakus, the Court was considering the Emergency Price Control Act, a temporary wartime measure which had been adopted as an emergency provision in the interests of national defense and security. It held that the statute and its procedural complements prescribed an exclusive procedure for the determination of the validity of any regulation or order issued under that Act. In fact, Section 204(d) specifically declared "the Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2 * * *." Confronted with this provision and Section 203 which related to agency review, the Court held that the procedure described by these sections for determining the validity of the administrators' price regulations—by protest to and hearing before the administrator whose determination might be reviewed on complaint to the Emergency Court of Appeals—was exclusive. This precluded the defendant from challenging the validity of the regulations in a criminal prosecution brought by the Government for a violation of an order issued under the Act.

Of obvious significance to the decision was the Court's observation that in wartime such measures were necessary to prevent widespread inflation and inconsistent rulings which would have the effect of undermining the entire emergency measure.

In United States v. Ruzicka, supra, the Court held that the defendants in a civil enforcement proceeding under the Agricultural Marketing Agreement Act of 1937 could not challenge the validity of certain administrative action. The Court, however, narrowly confined its decision to the interpretation of the particular Act before it, noting that:

[T]he recent growth of administrative law counsels against generalizations regarding what is compendiously called judicial review of administrative action. And so we deem it desirable, in a case like this, to hug the shore of the precise problem before us in relation to the provisions of the particular Act im-

10. "The exceptions to the rule that one may challenge an order or regulation in an enforcement proceeding require special consideration; the most notable exceptions are exemplified by the Yakus and Ruzicka cases." Davis, supra, ¶ 23.07 at p. 321.

mediately relevant. 329 U.S. at 295, 67 S.Ct. at 211.

The other cases relied upon by the Government for this point are in a similar vein. The acts involved in each of them prescribed elaborate agency procedures with an obvious congressional intent that the specified procedure should be followed. This is not the case now before the Court. If the Commission had a specified internal procedure that could be invoked whenever an alleged violation of a Service Order occurred, then these cases might be pertinent. The fact is, however, that no such procedure is provided, let alone made mandatory. United States v. Sykes, 310 F.2d 417 (5th Cir. 1962). See also Weir v. United States, 310 F.2d 149 (8th Cir. 1962). Compare United States v. McCrillis, 200 F.2d 884 (1st Cir. 1952). See the discussion by Jaffe, The Judicial Enforcement of Administrative Orders, 76 Harv.L.Rev. 865 (1963).

The Government has elected to seek penalties against Southern in this controversy before this Court. In so doing, it has inescapably laid open to review the validity and meaning of the order on which its action rests.

### III

 Southern's last point is that Service Order No. 947 does not impose liability without fault. Averred is that reasonably read, in light of admitted facts, it is clear that the Order has not been violated. This "strict" construction urged on behalf of Southern is based on the accepted principle that the law abhors a forfeiture and courts will seize upon even slight evidence to avoid one. See In re Physicians and Dentists Investment Corp., 248 F.Supp. 968. (D.S.C.1966). Regulations involving penalty-forfeiture provisions must be similarly construed.

 Read literally, Service Order 947 is absolute in its terms. It states categorically that inbound cars shall be placed within a stated period and that outgoing cars shall be removed within a stated period. It may, however, be assumed that the Order was not meant to impose liability without fault. So purposed, the Order would be neither just nor reasonable as required by the Act.

Implicit as an element of violation, therefore, is the absence of reasonable cause for the failure. Otherwise a railroad could be penalized for non-adherence to the time limits set in Service Order 947 in spite of impossiblity of performance, act of God or some other factor preventing strict compliance with literal language. In the instant case, for example, the derailment at the Greenville yard was directly responsible for all but one of the cited failures to meet the time requirements of Service Order 947. These failures cannot be properly regarded as violations.

To seek penalties under Service Order 947 where compliance has not been reasonably possible will not advance the Order's aims. To add an unconscionable monetary penalty to the misfortune that prevented the carrier's compliance with the strict mandate of Service Order 947 cannot promote speed of car handling. Chief Judge Thomsen of the United States District Court for the District of Maryland refused to give a Service Order such an interpretation in Western Maryland Ry. Co. v. Commodity Credit Corp., 154 F.Supp. 508, 511 (D.Md.1957). The court granted the defendant shipper's motion for summary judgment, concluding that the purpose of the order was to expedite movement of cars and that, since the shipper had not been negligent, "here the only result would be an increase in the railroad's pay."

Similarly, in Iversen v. United States, D.C., 63 F.Supp. 1001, aff'd per curiam, 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998, a group of shippers petitioned a three-judge court to enjoin the execution of certain Service Orders relating to demurrage rules and charges on the use of refrigerator cars. The orders in question had been issued without hearings under the emergency powers conferred by Section 1(15). The existence of an emergency and the reasonableness of the charges were not challenged. The only question was the statutory power of the

Commission to promulgate the orders. The court, though upholding their general validity, set aside and enjoined their application to certain days during the Christmas holidays when compliance would be impossible because of the absence of labor.

> Upon that premise it appears that the orders could not, in respect to those days, accomplish any part of their sole objective, i. e., the unloading of cars. Their only result, so far as those days are concerned, would be to cause payments to be made to the railroads by shippers. We think that emergency orders with that sole result are arbitrary. 63 F.Supp. at p. 1006.

If construed to subject Southern Railway to substantial monetary penalties when its good faith compliance is hampered by a derailment. Service Order 947 would be similarly arbitrary.

The ruling in Iversen reflected a reasonable and proper judicial construction that should be here applied. Conversely, the imposition of liability under such circumstances runs counter to basic concepts of justice. As then Chief Judge Timmerman pointed out in Adams v. Pitts, 140 F.Supp. 618, 621 (E.D.S.C. 1956):

> It should not be presumed that Congress intended to enact an unfair and discriminatory statute unless the statute clearly requires such a construction. The fact that one of two alternative constructions would be fair and just is sufficient reason to adopt that construction.

The Supreme Court has cautioned that statutory wording must not be blindly applied in derogation of the enactment's intent. United States v. American Trucking Ass'ns., 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345. As Judge Bryan said in Giddens v. Isbrandtsen Co., Inc., 355 F.2d 125, 127 (4th Cir. 1966): "[I]mperceptive adherence to any statute is to be discountenanced * * *."

To read Service Order 947 as imposing absolute liability would clearly not advance the policy as stated in its preamble. And when courts may look beyond the words of Congress to the intent of its legislation, the draftsmanship of the Commission surely commands no blind judicial deference. As the affidavits reveal, the occurrences around which this complaint turns derived mainly from a derailment in Southern's Greenville yard. Service Order 947 need not and should not be read to impose penalties under such circumstances.

For the reasons given, Southern's motion for Summary Judgment will be granted. The Clerk will enter Judgment accordingly.

And it is so ordered.