**UNITED STATES of America,**
**Appellant,**

v.

**SOUTHERN RAILWAY COMPANY,**
**Appellee.**

**No. 10769.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1967.

Decided May 30, 1967.

**50**

Roberts B. Owen, Washington, D. C. (Duncan B. Phillips and Michael J. Henke, Washington, D. C., on the brief), for appellee.

Before SOBELOFF and BOREMAN, Circuit Judges, and KAUFMAN, District Judge.

SOBELOFF, Circuit Judge:

We are confronted in this appeal with an important question of administrative law concerning the procedure by which a dissatisfied carrier may challenge the validity of a regulation of the Interstate Commerce Commission. The District Court granted the defendant Southern Railway Company's motion for summary judgment in the action brought by the United States to enforce statutory penalties for violation of car service orders issued by the Commission.[1] The basic issue is whether by invalidating the order in question the District Court exceeded its jurisdiction.

On November 7, 1963, Division 3 of the Commission, finding that an acute shortage of freight cars existed throughout the country and that unjustifiable delays in the placement and removal of available cars were impairing effective utilization of freight car capacity, declared that an "emergency" existed and published Car Service Order No. 947. The order sought to increase the efficiency of commercial rail transportation by requiring that cars be positioned for unloading on consignees' tracks within a specified time after their arrival at the carrier's yards; empty or newly loaded cars had to be removed within an equivalent period.[2] A

---

1. United States v. Southern Ry. Co., 250 F.Supp. 759 (D.S.C.1966).

2. The Commission's findings and relevant portions of Service Order No. 947 are as follows:

> "*It appearing*, That an acute shortage of freight cars exists in all sections of the country; that cars loaded and empty cars are unduly delayed in terminals and in placement at, or removal from industries; that present rules, regulations and practices with respect to the use, supply, control, movement, distribution, exchange, interchange, and return of freight cars are insufficient to promote the most efficient utilization of cars; it is the opinion of the Commission that an *emergency* exists requiring immediate action to promote car service in the interest of the public and the commerce of the people. Accordingly, the Commission finds that notice and public procedure are impracticable and contrary to the public interest, and that *good cause exists for making this order effective upon less than thirty days' notice.*

> "*It is ordered*, That:
> § 95.947 *RAILROAD OPERATING REGULATIONS FOR FREIGHT CAR MOVEMENT*
> (a) Each common carrier by railroad subject to the Interstate Commerce Act shall observe, enforce and obey the following rules, regulations and practices with respect to its car service:
> (1) *Placing of Cars:*
> (a) Loaded cars, which after placement will be governed by demurrage rules applicable to detention of cars awaiting unloading, shall be actually or constructively placed within 24 hours after the first 7:00 a. m., exclusive of Saturdays, Sundays, and holidays, following arrival at destination.
> (b) Actual placement means placing of car on consignee's tracks, or when for public delivery, placement on carrier's tracks accompanied by proper notice.
> (c) When delivery of a car, either empty or loaded, consigned or ordered to an industrial interchange track or to other-than-a-public-delivery track can-

copy of the order, which was to become effective four days later, was served on the Association of American Railroads as agent for most of the nation's railways, including Southern.[3]

The Commission's customary practice is to issue rules and regulations after a hearing at which interested carriers may present their views. It is authorized, however, by section 1(15) of the Interstate Commerce Act, 49 U.S.C. § 1(15), to dispense with a preliminary hearing whenever it is of the "opinion that * * [an] emergency requiring immediate action exists * * *."[4] In this instance the Commission, in view of its finding of

not be made on account of any condition attributable to the consignee, such car will be held at destination or, if it cannot reasonably be accommodated there, at an available hold point and constructive placement notice shall be sent or given the consignee in writing within 24 hours, exclusive of Saturdays, Sundays, and holidays, after arrival of car at hold point.

(d) Loaded cars held at billed destination for accessorial terminal services described in the applicable tariffs, such as holding for orders of inspection, shall be placed on carrier's or consignee's unloading or inspection tracks, within 24 hours, exclusive of Saturdays, Sundays, and holidays, after arrival at billed destination. On cars set off and held short of billed destination, a written notice shall be sent or given to consignee within 24 hours following the first 7:00 a. m. after arrival at hold point.

(2) *Removal of Cars:*

(a) Empty cars must be removed from point of unloading or interchange tracks of industrial plants *within 24 hours after the first 7:00 a. m.,* exclusive of Saturdays, Sundays, and holidays, following unloading or release by consignee or shipper, unless such cars unloaded are ordered or appropriated by the shipper for reloading within such a 24-hour period. Empty cars not required for loading at point where made empty must be forwarded in line-haul service within 24 hours after the first 7:00 a. m., exclusive of Saturdays, Sundays, and holidays, following removal of empty car.

(b) Outbound loaded freight cars must be removed from point of unloading or interchange tracks of industrial plants *within 24 hours after the first 7:00 a. m.,* exclusive of Saturdays, Sundays, and holidays, following tender and acceptance by carrier of the bill of lading covering the cars. Such cars must be forwarded in line-haul service within 24 hours after the first 7:00 a. m., following their receipt in outbound make-up or classification yards. (Emphasis added.)

3. The order also appeared in the Federal Register of November 14, 1963. 28 Fed. Reg. 12127–12128.

The Commission's finding that good cause existed for making the order effective upon less than thirty days notice, see footnote 2, supra, satisfied the requirement of the Administrative Procedure Act, 5 U.S.C. § 1001 et seq., that "[t]he required publication or service of any *substantive* rule * * * shall be made not less than thirty days prior to the effective date thereof except as provided by the agency upon good cause found and published with the rule." § 1003(c).

4. Section 1(15) provides in pertinent part that:

"*Powers of Commission in case of emergency*

Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the Commission; (b) to make such just and reasonable *directions* with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; * * *." (Emphasis added.)

emergency, proceeded under Section 1 (15). The Act nevertheless permits an affected carrier to file a petition for "rehearing, reargument or reconsideration" in advance of the effective date of the order, and this automatically stays implementation of the Commission's order until it has ruled on the petition.[5] Southern failed to avail itself of this option and did not contest the order's validity until the commencement of the present action.

The government's complaint alleged that between January 23, 1964 and February 24, 1964 Southern violated the order on twenty separate occasions by failing to observe the prescribed time limits at its Greenville, South Carolina yard. Demand was made for the imposition of the maximum $500.00 fine for each violation. Southern admitted noncompliance with the time limits, but insisted that standing alone these defaults were insufficient to create liability. Its position was that the order should not be interpreted to subject it to liability without fault, and that all but one of the delays in car placement and removal were occasioned by two train derailments, one in the Greenville yard and the other several miles north of the yard, making compliance impracticable.

Southern's version of the circumstances surrounding the alleged violations is as follows. The derailments severely disrupted normal operations at the Greenville Yard from January 28, 1964 to March 1, 1964. Throughout this period it concentrated on clearing and repairing damaged tracks and insuring the uninterrupted flow of through traffic. Implementation of this policy required committing almost all of its equipment, and it was unable to use switch engines to transfer freight cars to and from the various sidings. Diverting men and machinery necessary to achieve compliance with the order would, it asserted, have created a bottleneck at the yard and would have seriously dislocated rail traffic along the Eastern seaboard. Viewing its course of conduct as the most expeditious method of keeping cars in service, Southern argued that it had acted consistently with the broad underlying purpose of the order.

Southern further contended that the order was invalid because no "emergency" existed justifying disregard of the notice and hearing requirements of section 1 (14).[6] It asserted that the nationwide freight car shortage which prompted issuance of the order had existed since 1955 and that the Commission was aware of it from that time.[7] The railroad also maintained that by employing the term "directions" in section 1(15), as contrasted with the phrase "rules, regulations and practices" in section 1(14), Congress contemplated a limited order designed to deal with specific, non-recurring problems, for example, isolated car shortages in a confined geographic area, and did not authorize the Commission to promulgate broad, semi-permanent regulations without affording a full preliminary hearing.

The United States moved for summary judgment based on the triple-pronged contention (1) that the pleadings raised no genuine issues as to any material fact,

---

5. 49 U.S.C. § 17(8)
   Application for rehearing, reargument or reconsideration may also be made after the regulation becomes effective, but such an application does not excuse compliance "without the special order of the Commission." Ibid.
6. Section 1(14) (a) of the Act establishes the ordinary Commission procedures for the issuance of rules and regulations. It provides that:
   "The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable *rules, regulations, and practices* with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and any other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for nonobservance of such rules, regulations or practices." (Emphasis added.)
7. See United States v. Southern Ry., 364 F.2d 86 (5th Cir. 1966).

(2) that Southern could not challenge the validity of the order in enforcement proceedings, and (3) that, in any event, the order was valid. Southern responded with a cross-motion for summary judgment, to which it appended the affidavit of General Yardmaster Caldwell of the Greenville Yard setting forth the actions taken by Southern in response to the derailments and stating his conclusion that they were "the most expeditious way to keep cars in service." Southern's thrust was met by a government parry in a counter-affidavit by Commission agent Crosby, who was responsible for policing Southern's operations at the yard. Crosby stated that the effects of the derailments did not render compliance with the time limits either impossible or unreasonable. The District Court ruled that the Commission's order was open to attack and granted Southern's motion, holding that the order, which it characterized as a "sweeping pronouncement," was entirely inconsistent with the concept of emergency "directions,"[8] and that it "sought to deal with a chronic problem, not an emergency."[9] Alternatively, the court held that Southern had not violated the order.

## I.

We think that the District Judge erred in entertaining Southern's challenge to the validity of the order. In our view the statutory provisions governing review of Commission orders, set forth in the margin,[10] were intended to confine the presentation of such challenges to a specially convened three-judge district court after the carrier has filed, and the Commission has ruled upon, a petition for "rehearing, reargument or reconsideration."

This was the conclusion of the Fifth Circuit in United States v. Southern Ry., 364 F.2d 86 (1966), where the attack was against Car Service Order No. 939, the predecessor of No. 947, and we express our approval of its reasoning and conclusions.[11] The posture of the Fifth Circuit case was identical to that of the instant case. There, as here, the United States appealed from a single district judge's grant of the carrier's motion for summary judgment based on the claimed invalidity of the Commission's Service Order. Holding that the administrative and judicial review procedures elaborated by Congress are the exclusive avenues for

---

8. 250 F.Supp. at 753.

9. Id. at 764.

10. Section 17(6) of the Act, 49 U.S.C. § 17(6), reads in pertinent part that "[a]fter [an] * * * order * * * shall have been made by * * * a division * * * any party thereto may * * * make application for rehearing, reargument, or reconsideration of the same * * *."

If the Commission denies the carrier's application for rehearing, reargument or reconsideration, judicial review of the order may be sought pursuant to section 17(9). That section provides:

"When an application for rehearing, reargument, or reconsideration of any * * * order * * * of a division * * * shall have been made and shall have been denied, * * * a suit to enforce, enjoin, suspend, or set aside such * * * or set aside such * * order * * * in whole or in part, may be brought in a court of the United States under those *provisions of law*

*applicable* in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise." (Emphasis added).

The "provisions of law applicable" to actions seeking review of Commission orders are set forth in 28 U.S.C. § 2325 as follows:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part, or any order of the Interstate Commerce Commission shall not be granted unless the application thereof is heard and determined by a district court of three judges * * *."

11. See also United States v. Union Pacific R. R., Civil No. 65–81, (D.Ore. August 8, 1966), where the district judge refused to entertain the carrier's challenge to the validity of Service Order No. 947, relying upon the Fifth Circuit's decision. The court found "unpersuasive" both United States v. Thompson, 58 F.Supp. 213 (E.D. Mo.1944), discussed in note 15, infra, and the decision here under review.

attack of Commission regulations, the Fifth Circuit stated:

"A long line of Supreme Court cases establishes the principle that where Congress has provided administrative and judicial review procedures which are designed to permit agency expertise to be brought to bear upon particular problems, the prescribed procedures are exclusive, and this is true even though Congress may not have expressly provided for the exclusiveness of the statutory procedure." 364 F.2d at 91 (Citations omitted).[12]

■ Underlying the Fifth Circuit's decision is a recognition that the Commission has been entrusted by Congress with primary responsibility for the formulation of fair and effective rules to govern commercial rail transportation within the general framework of the Act. The purpose of sections 17(6) and 17(9)[13] is to enable the Commission, in light of specific criticism leveled by affected carriers, to reconsider and maturely reflect upon its order. This opportunity, which Southern would have us deny the Commission, is even more valuable, where, as here, the order has been issued pursuant to section 1(15), without notice and hearing, than where issued under section 1(14). In the latter case, the Commission has had the benefit of a full airing of the pros and cons of its proposed course of action. Where the "emergency" nature of a section 1(15) proceeding makes a preliminary hearing impractical, the petition for reconsideration provides an ideal instrument for the Commission to explore objections of the railroads and to determine whether they are of sufficient substance to overcome the need for immediate action or to call for revision.

Even though a petition for reconsideration, if filed before the effective date of the order, has the effect of staying implementation pending further Commission action, this is by no means the equivalent of requiring a plenary hearing before issuance. Coming as it does after publication of the order, the petition is likely to be directed at its specific provisions and will undoubtedly focus either on their legality or on the deleterious effects apprehended from their implementation. On the other hand, hearings held prior to issuance, while often extremely valuable, are frequently seized upon as an opportunity to air general grievances, both real and fancied, entirely unrelated to the specific problem which generated the hearing and proposed order. Such hearings tend to become protracted and the records correspondingly grow in volume. In the context of an "emergency requiring immediate action," the predicate of a section 1(15) proceeding, these drawbacks are magnified and the desirability of a petition for reconsideration, rather than an initial plenary hearing, becomes more apparent.[14]

12. Section 17(9) of the Act, see note 10 supra, providing that a carrier may bring an action to set aside an order *after* the Commission has denied a petition for reconsideration, closes with the words "but not otherwise." The Fifth Circuit, reasonably attributing to this phrase its common meaning, relied upon it to buttress the holding that administrative review must be exhausted before judicial relief may be sought. 364 F.2d at 93.

In our court, Southern argues that the phrase was incorporated in the Act solely to condition the institution of suits to "enforce, enjoin, suspend, or set aside" Commission orders, and was not meant to preclude a carrier from testing the validity of an order in penalty enforcement proceedings, notwithstanding its failure to petition for reconsideration. However this may be, we do not exclusively rely (nor did the Fifth Circuit) on the "but not otherwise" phraseology. Acceptance of Southern's argument does not militate *against* our conclusion.

13. See note 10, supra.

14. The same considerations are relevant when the petition is filed after the effective date of the order. If, as in this case, the Commission decides that immediate corrective action is necessary and therefore reduces the customary thirty-day waiting period, see note 3, supra, a carrier unable to petition for reconsideration before the effective date of the order should be required to request that the Commission exercise its discretion to ex-

The District Court discussed at some length the cases of Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) and Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), but we find nothing in them that militates against our conclusion. Both turned on an interpretation of 28 U.S.C. § 2282, which requires the convening of a three-judge court in an action to declare an act of Congress unconstitutional and to enjoin its enforcement. The rule emerging from the opinions is that where a judgment in favor of the plaintiff would not enjoin operation of the statute a single district judge may properly decide the case.[15] As Southern's attack is aimed at the specific order, and not the statutory provisions themselves, the District Court thought these holdings persuasive with respect to the proper interpretation of section 2325. The policy underlying section 2282, however, preventing a single district judge from declaring an entire federal program unconstitutional and enjoining its operation pending further review, is entirely unrelated to the purpose of sections 17(6) and 17(9), the establishment of an integrated administrative and judicial procedure channeling attacks on Commission orders. We think that the judicial gloss on section 2282 is not controlling here.[16]

## II.

■ Because we hold that the District Court was without authority to consider the challenge to the merits of the order, we need not resolve the question of the order's validity.[17] We are, however, called

---

cuse compliance pending action on the petition. See note 5, supra. In both cases, our interpretation of the statute requires that relief first be sought from the Commission.

15. In *Nestor*, the district court merely required reinstatement of the plaintiff's old-age benefits.

In *Mendoza-Martinez*, the district court entered a declaratory judgment that the federal statute attacked was unconstitutional. The Supreme Court noted that such a judgment is "totally non-coercive * * *." 372 U.S. at 155, 83 S.Ct. 554.

16. The District Court also discussed the decisions of two other district courts which, in substantially similar circumstances, entertained challenges to the validity of Commission orders in enforcement proceedings. Neither case is persuasive. In United States v. Thompson, 58 F.Supp. 213 (E.D.Mo.1944), there is no indication that the District Judge considered the question of his jurisdiction to declare the order invalid. The issue which is squarely presented to us was not adverted to in his opinion. United States v. Southern Ry., (M.D.Ga. 1964), the second case relied on by our District Court, was later reversed by the Fifth Circuit in United States v. Southern Ry., 364 F.2d 86 (1966). See note 11, supra, and accompanying text.

The District Court also appears to have been influenced by the fact that, as it stated in its opinion, "[i]n numerous proceedings the courts have construed and interpreted such orders." (Citing cases.) 250 F.Supp. at 767. However, none of the cited cases sought the enforcement of statutory penalties, and in one, Baltimore & Ohio R. R. v. Lambert Run Coal Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922), the Supreme Court specifically disavowed the Court of Appeals' discussion of the merits of the dispute. The Court stated:

"The decree of the District Court was properly reversed; but we are of opinion that the Circuit Court of Appeals had no occasion to pass upon the merits of the controversy and that the direction should have been to dismiss the bill for want of jurisdiction and without prejudice. The rule of the railroad here complained of was that prescribed by the Commission. To that rule the railroad was bound to conform unless relieved by the Commission or enjoined from complying with it by decree of a court having jurisdiction. By this suit such a decree was in effect sought. The appellate court was therefore correct in holding that in such a suit an injunction of the District Court could be granted only by three judges." 258 U.S. at 381–382, 42 S.Ct. at 350.

17. We fully share the District Court's concern that section 1(15) shall not be construed by the Commission to afford it *carte blanche* authority to issue permanent and sweeping regulations. The juxtaposition of sections 1(14) and 1(15) convincingly demonstrates the correctness of the general approach taken by the District Court. However, we do not agree with the District Court's interpretation that an "emergency" within the

upon to decide whether the court was correct in holding, on a motion for summary judgment, that Southern did not violate the order.

The District Court, assuming that the order was not intended to impose absolute liability, stated that "the derailment at the Greenville yard was directly responsible for all but one of the cited failures to meet the time requirements of Service Order 947 * * *." This assumption, coupled with the conclusory assertion culled from the affidavit supplied by the railroad, is the sole predicate for the summary judgment in Southern's favor.

■ After carefully reading the opposing affidavits and thoroughly reviewing the entire record, we conclude that summary judgment in favor of neither party was appropriate, with the single exception of the violation charged in count 15. This count involved a delay in car removal that matured into a violation of the order before occurrence of either of the derailments upon which Southern

relies to excuse its failure to comply.[18] As to this count, the United States is therefore entitled to summary judgment.

We agree with the District Court that the controlling legal question as to the remaining 19 counts is whether there existed reasonable grounds for Southern's non-observance of the time limits. The United States apparently concurs in this formulation of the issue, for in this court it has conceded that the order was not meant to impose absolute liability regardless of circumstances. Taking this as the touchstone, we do not find the opposing affidavits sufficiently comprehensive and detailed to warrant disposition on summary judgment. The Crosby affidavit, upon which the United States relies, is the more particularized, yet it fails to demonstrate conclusively that Southern's delays in car placement and removal were not justified in the existing conditions. The thrust of the affidavit is that Southern physically *could* have complied with the order, but it fails to show that, despite the derailments, it *should* have complied.[19]

meaning of section 1(15) is necessarily a problem which is sudden in origin or temporary in nature and that the Commission is *per se* precluded from dealing with chronic problems under that section by the appropriate exercise of its discretionary authority.

The contours of a "direction" issued in response to a specific emergency situation are necessarily shaped by the character of the emergency. Certainly, one could not say that a nationwide power failure, such as that which paralyzed the northeast United States several years ago, would not justify an equally broad direction effective not only for the duration of the failure but for as long as its effects are felt. Similarly, it would be unreasonable to restrict the definition of "emergency" to those situations in which the underlying facts are sudden and unforeseen. The cumulative adverse effect of isolated freight car shortages over a period of time could well reach a level requiring immediate and drastic action, constituting an "emergency" notwithstanding the Commission's awareness of the course of prior events.

18. The first derailment occurred on January 28, 1964. To conform to the order,

the car in question should have been removed by January 23, 1964.

19. Commission Agent Crosby meticulously details the number of cars handled and the number of switch engines available in the Greenville Yard throughout the period of the alleged obstructions attributable to the derailments. He concludes that there was no significant decline in the number of cars handled except on the date of the Greenville Yard derailment and that there were always engines available to perform the switching.

The crucial inquiry, however, is which cars were handled and why. By concentrating on through traffic, Southern may have been able to maintain a uniform level of cars handled; yet had it literally observed the time limits contained in the order, the number of cars handled might have drastically declined. We cannot say, on the state of this record, that Southern acted reasonably or unreasonably. Amplification of the record is necessary to determine if Southern was forced to choose between maintenance of through traffic and compliance with the order and whether the choice made was a reasonable one.

On the other hand, the Caldwell affidavit relied upon by Southern is much too general to justify a legal holding that Southern was *forced* to choose between compliance with the order and maintaining the flow of through traffic. Conceivably Southern could have accomplished both objectives, and the Caldwell affidavit does not dispel this factual hypothesis. There are unresolved genuine issues of material fact and, with the exception of count 15, amplification of the record, whether by additional affidavits or full trial, is necessary before an informed legal judgment may be made.[20]

Reversed and remanded with instructions.

20. With respect to its contention that the order is invalid, we have heretofore noted, see note 5 supra and accompanying text, and we note again that Southern may file with the Commission a petition for reconsideration. While, ordinarily, such petitions must be filed within thirty days after the order is served on the complaining party, the Commission's regulations provide an exception "for good cause shown." 49 C.F.R. § 1.101(e) (1963). Of course, it is within the Commission's discretion to entertain the petition, and we intimate no view as to how this discretion should be exercised.