**UNITED STATES of America,**
**Appellant,**

v.

**SOUTHERN RAILWAY COMPANY,**
**Appellee.**

No. 22588.

United States Court of Appeals
Fifth Circuit.

July 27, 1966.

Rehearing Denied Sept. 22, 1966.

Frederick B. Abramson, Alan S. Rosenthal, Kathryn H. Baldwin, Attys., Dept. of Justice, Washington, D. C., for appellant.

Charles J. Bloch, Macon, Ga., Paul C. Warnke, Charles W. Havens, III, Washing, D. C., for appellee.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and KILKENNY,* District Judge.

KILKENNY, District Judge:

The United States appeals from a summary judgment entered against it in an action against appellee (Southern) under the provisions of 49 U.S.C. § 1(17). The appellant sought to recover penalties in connection with the appellee's violations of an order promulgated by the Interstate Commerce Commission under the provisions of 49 U.S.C. § 1(15).

After filing of defensive pleadings and certain affidavits, each party moved for a summary judgment. The motion of Southern was allowed. The trial judge held: (1) that the order was procedurally invalid in declaring an emergency; (2) that the order was so vague, indefinite and uncertain as to violate the constitutional rights of Southern; and (3) that Southern was not required to avail itself of the administrative and judicial review procedure provided in the Interstate Commerce Act.

A thorough look into the history of the box car shortage problem is necessary for an intelligent understanding of the legal issues presented, and the reason for the promulgation of the order by the Commission. Long prior to the inception of this litigation, the supply of box cars was acute. The problem was noted in the annual report of the Commission to the Congress for the period November 1, 1954, to October 31, 1955.[1] The concern of the Commission was such that it recommended to the Congress that 49 U.S.C. § 1(15) be amended to authorize the assessment of a penalty per diem charge as an aid in an emergency or threatened emergency. The Congress failed to act on this recommendation. Again, in 1957, the Commission again recommended legislation on the subject and labeled the report of "fundamental importance."[2] The Congress again failed to act. Similar recommendations to the Congress were repeated for the next four years, all without action. In the meantime, the problem worsened to such an extent that "railroad piracy" commenced, with a number of the lines refusing to return box cars to the owner. The shortage became so acute in March, 1962,[3] that the railroads, by their own Special Car Order No. 103, attempted to solve the problem. For all practical purposes, the order was ignored, and, as a result, railroad shippers and shipper associations appealed to the Commission's Safety and Service Board No. 1, requesting that action be taken in order to obtain an equitable distribution of the car supply and to put an end to "pirating." This group appeal was addressed to the powers of the Commission under 49 U.S.C. § 1(14) (a),[4] to those powers

---

* Of Portland, Oregon, sitting by designation.

1. 69th Annual Report of the Interstate Commerce Commission. (United States Government Printing Office, Washington, D. C., 1956, p. 121.)

2. 71st Annual Report of the Interstate Commerce Commission. (United States Government Printing Office, Washington, D. C., 1957, p. 136.)

3. 76th Annual Report of the Interstate Commerce Commission. (United States Government Printing Office, Washington, D. C., 1962, p. 104.)

4. 49 U.S.C. § 1(14) (a).
"The Commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by common carriers by railroad subject to this chapter, including the compensation to be paid and other terms of any contract, agreement, or arrangement for the use of any locomotive, car, or other vehicle not owned by the carrier using it (and whether or not owned by another carrier), and the penalties or other sanctions for non-observance of such rules, regulations, or practices."

granted in 49 U.S.C. § 1(15) [5] and to 49 U.S.C. § 1(17) (a), which requires all rail carriers, and their officers, agents and employees, " * * * to obey strictly and conform promptly .* * * " to car service directions or orders made by the Commission, or its designated agent. Penalties are provided of not less than $100.00, nor more than $500.00 for each offense, plus $50.00 for each day the offense continues. These penalties are made recoverable in a civil action.

The Safety and Service Board [6] to which the appeal of the group was directed held a meeting on May 21, 1962, and there decided that the acute shortage of box cars, coupled with the ineffectiveness of the then existent carrier rules and regulations with respect thereto, had resulted in an emergency. An emergency was thereupon declared. The Board, at that meeting, also determined that immediate action was required in all parts of the country and that notice was impracticable. The Board then and there promulgated its Service Order No. 939 to be effective as of May 27, 1962, with an ex-piration date of December 31st of that year. Essentially, the order, issued by the Board, was nothing more than a restatement of the Special Car Order of the Association of American Railroads, previously mentioned. The order was served on May 27th on the Car Service Division of the Association of American Railroads, as agent for practically all of the nation's lines, including Southern. Notice to the general public was made on May 26, 1962, by publication in the Federal Register.[7]

On June 4, 1962, the Board vacated its Order No. 939 and issued Revised Service Order No. 939 to be effective June 5, 1962, and to expire on December 31st of the same year. Service was again made on the agent. The revised order was essentially the same as the original. No protest was made by Southern as to the vagueness of either order, or otherwise. For that matter, the vice-president of the appellant on July 5, 1962, directed a letter to the Commission in which appellant seemed to be in full agreement with the requirements of the order and declared

5.  49 U.S.C. § 1(15).
  "Whenever the Commission is of opinion that shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing, or the making or filing of a report, according as the Commission may determine: (a) to suspend the operation of any or all rules, regulations, or practices then established with respect to car service for such time as may be determined by the Commission; (b) to make such just and reasonable directions with respect to car service without regard to the ownership as between carriers of locomotives, cars, and other vehicles, during such emergency as in its opinion will best promote the service in the interest of the public and the commerce of the people, upon such terms of compensation as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after sub-sequent hearing find to be just and reasonable; (c) to require such joint or common use of terminals, including main-line track or tracks for a reasonable distance outside of such terminals, as in its opinion will best meet the emergency and serve the public interest, and upon such terms as between the carriers as they may agree upon, or, in the event of their disagreement, as the Commission may after subsequent hearing find to be just and reasonable; and (d) to give directions for preference or priority in transportation, embargoes, or movement of traffic under permits, at such time and for such periods as it may determine, and to modify, change, suspend, or annul them. * * * "

6.  All of the Commission's work, powers, business and functions in connection with car-service matters and all emergency directions pertaining thereto had been assigned to the Safety and Service Board No. 1, 26 F.R. 861, subject, however, to administrative review and supervision by Division 3 of the full Commission. 26 F.R. 862.

7.  27 F.R. 4965.

its intention to comply therewith.[8] By the fall of 1962, the complaints of acute shortages of double-door 40 foot and 50 foot box cars reached a point where the Chairman of the Commission directed a letter to Southern's president calling attention to the millions of bushels of grain on the ground in Nebraska, the vast amount of milo on the ground in Texas, the soy beans on the ground in Kansas, Missouri, Illinois and Indiana, all because of the box car shortage. Attention was likewise directed to the plight of the lumber industry in the Pacific Northwest. By mid-December, it became evident that the expiration date of the order should be extended to April 30, 1963. The amendment was served on December 18th and notice given on December 22nd.[9] Again, there was no protest from Southern over the extension of the expiration date or otherwise. The problem continued to worsen, so that on February 5, 1963, the Board again met, vacated Revised Order No. 939 and its amendment. It then issued Second Revised Service Order No. 939, which again recited and declared that an emergency existed.[10] The order, here under attack, declared an effective date as of February 6th and an expiration date as of April 30th, unless otherwise ordered.[11] Service was made on Southern's agent on February 6, 1963. The substance of the order was essentially the same as the previous orders.[12] Southern made no objection to this order, nor did it make a claim that the order was in any way vague. On April 12, 1963, this order was amended to extend the expiration date to December 31st. On Novem-

8. The minor corrections in the corrected Service Order of May 25, 1962, published in the Federal Register on June 1, 1962, 27 F.R. 5141, are here of no importance.

9. 27 F.R. 12718.

10. "At a Session of the Interstate Commerce Commission, Safety and Service Board No. 1, held in Washington, D. C., on the 5th day of February, A.D. 1963.

"It appearing, That an acute shortage of box cars, fifty-foot long or longer and box cars forty-foot long or longer with side door openings eight-foot wide or more; and it appearing, that the present carrier rules, regulations, and practices with respect to the use, supply, control, movement, distribution, exchange, interchange and return of box cars of these dimensions to the railroads owning such cars are ineffective; the Commission is of the opinion that an emergency exists requiring immediate action in all parts of the country, and that notice and public procedure are impracticable and contrary to the public interest and that good cause exists for making this order effective upon less than thirty days' notice."

11. 28 F.R. 1297.

12. *　　*　　*　　*　　*

"(b) Each common carrier by railroad subject to the Interstate Commerce Act shall observe, enforce, and obey the following, rules, regulations, and practices with respect to its car service:

"(1) The provisions of this order apply to plain (XM, XME, and XI) forty-foot or longer box cars with side door openings of eight-foot or wider and plain (XM, XME and XI) fifty-foot or longer box cars with any size door openings of all ownerships, including all box cars with plug doors.

"(2) For purposes of this order, districts as shown in the Official Railway Equipment Register, I.C.C. R.E.R.-No. 343, supplements thereto or subsequent reissues thereof govern. These districts are identified as Association of American Railroads car selection chart showing home districts for all principal freight car ownership.

"(3) Cars locating in a home district may be used only for loading to a destination on or via owner's rails or to a junction with the owner.

"(4) Cars locating in a district adjacent to a home district may be used only for loading to a home district or beyond if routed via the owner.

"(5) Cars locating in other districts (not home districts or districts adjacent thereto) may be used for loading to, via, or in the direction of the owner, or to any destination within a home district or within a district adjacent or intermediate to a home district.

"(6) Cars locating empty at a junction with the owner must be loaded to or via the owning road or delivered owner empty at that junction.

"(7) In the absence of proper loading, cars must be moved, to the owner empty under Association of American Railroads Car Service Rules or Special Car Order 90."

*　　*　　*　　*　　*

ber 8th of the same year, while this litigation was pending, the Board vacated the order, that amendment becoming effective on November 11th.

Southern, in this case, is charged with 15 violations of the Order between March 30th and April 7th, 1963.

## I.

The District Judge took the position that even though Southern had failed to exhaust its administrative remedies by asking a review by a three-judge court [13] on the validity of the order, that he had inherent power, even though the attack was collateral in nature, to inquire into the validity of the Service Order under which the penalties were sought. We believe that the judge was in error.

The expertise of the Commission on problems in the industry which it regulates, has long been recognized. East Texas Lines v. Frozen Food Exp., 351 U.S. 49, 54, 76 S.Ct. 574, 100 L.Ed. 917 (1956); Chicago, R. I. & P. Ry. Co. v. United States, 284 U.S. 80, 95, 52 S.Ct. 87, 76 L.Ed. 177 (1931). The Latin phrase *tractent fabrilia fabri*,* is as apt today as when used by the Romans. Already mentioned is the fact that the Congress recognized the experience of the specially trained experts of the Commission and granted to them special power in connection with the issuance of railroad car special orders and with reference to declaring an emergency.[14] However, in delegating this power to the Commission, the Congress did not overlook administrative and judicial safeguards, such as the right to petition for a rehearing, reargument or reconsideration by the full Commission if the entire body made the ruling, or by an appropriate appellate body if the ruling was made by a division, an individual commissioner or a board.[15] If a person was dissatisfied with an order of the Commission he could ask an administrative review by the Commission itself,[16] and, if dissatisfied, then seek judicial relief.[17] The requirement of the statute that Administrative and Judicial Review be applicable to all cases of suits to enforce, enjoin, suspend or set aside orders of the Commission, has a direct reference to 28 U.S.C. § 2321, in which the Congress directed that the procedure to be employed in such cases required the creation of a three-judge court. Explicit in the language of the legislation is the requirement that judicial relief, other than for the payment of money or the collection of fines, penalties or forfeitures, must be obtained under §§ 2321–2325 of Title 28. A long line of Supreme Court cases establishes the principle that where Congress has provided administrative and judicial review procedures which are designed to permit agency expertise to be brought to bear upon particular problems, the prescribed procedures are exclusive, and this is true even though Congress may not have expressly provided for the exclusiveness of the statutory procedure. Whitney Bank v. New Orleans Bank, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). Other cases on the same subject are Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907); United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290

13. 28 U.S.C. §§ 2321–2325.

* Let smiths handle smiths' tools.

14. 49 U.S.C. § 17(1), (2), (3), (4); 49 U.S.C. § 1(15).

15. 49 U.S.C. § 17(6).

16. 49 U.S.C. § 16(6), 49 U.S.C. § 17(7).

17. 49 U.S.C. § 17(9).
"(9) When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or referred to him or it shall have been made and shall have been denied, or after rehearing, reargument, or reconsideration otherwise disposed of, by the Commission or an appellate division, a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise."

(1946) and Callanan Road Improvement Co. v. United States, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206 (1953). The Fifth Circuit recognized and applied the rule in Simpson v. Southwestern R.R. Co., 231 F.2d 59 (5th Cir. 1956). That Southern was fully aware of its right to a judicial review by a three-judge court is demonstrated by its participation in the action filed October 15, 1963, in the Middle District of Georgia, Macon Division, Civil No. 1939, in which interim relief was requested, as was the convening of a specially constituted three-judge district court. In that action, the validity of the Service Order was attacked, on the ground that no emergency existed, which justified the exercise of the Commission's emergency powers. The carriers later dismissed that action without prejudice.

■■ The legislation before us requires one who would challenge the validity of an order, to first seek administrative relief from Division 3 as the appellate division of the Commission. An application for such relief would automatically stay the effect of the order until the issue was administratively decided by the appellate division.[18] This procedure could have been followed by Southern and each order, and its amendments, challenged at the administrative level. For that matter, such an application is required before the judicial review section of the legislation becomes effective. Lambert Rum Coal Co. v. Baltimore & Ohio Ry. Co., 258 U.S. 377, 42 S.Ct. 349, 66 L.Ed. 671 (1922); Simpson v. South Western R.R. Co., supra. The trial judge was of the belief that this line of cases, including Interstate Commerce Comm. v. Consolidated Freightways, 41 F.Supp. 651 (D.N.D.1941) was not controlling. We disagree.

■ A substantial number of the authorities cited by Southern throw little, if any, light on the issue here presented. A typical example is Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The decision called for a construction of 28 U.S.C. § 2282, rather than § 2325. The restrictive language of the former, simply provides that an interlocutory or permanent injunction restraining the enforcement, operation or execution of an Act of Congress, should not be granted by any district court or judge unless application therefor is heard and determined by a three-judge court. The statute there in question was entirely separate and distinct from any administrative procedure. This legislation is a far cry from the all inclusive language of 49 U.S.C. § 17(9), requiring that "a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, *but not otherwise.*" (Emphasis supplied.) Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed. 2d 1435 (1960), likewise construing § 2282, is no better authority than *Kennedy*. We are not here concerned with the criminal prosecution, such as was involved in Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944), but that decision is in full support of appellant's views. More to the point is United States v. Ruzicka, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946), a proceeding by the United States under § 8a(6) of the Agricultural Marketing Agreement Act to enforce an order issued by the Secretary of Agriculture, requiring handlers of milk to pay money into a producer-settlement fund. To be observed is the similarity between an action to require the payment of money into a fund in Ruzicka and this action to require the payment of penalties. Defendants there attempted to go behind the order of the Secretary requiring the payment of the money into the fund and show that the requirement was based on a faulty inspection of accounts and improper tests. Defendants claimed the right to assert this defense in the enforcement proceeding. Stark v. Wick-

---

18. 14 U.S.C. § 17(8).

ard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944), was reconciled by showing that Congress had provided no administrative remedy for a producer to review the legality of an order against him, while Congress had so provided by § 8c (15) of the Agricultural Marketing Agreement Act. Attention was there directed to the many enactments of Congress in regulating economic enterprise in which the duty of enforcement was divided between the courts and the administrative agencies, and that the Congress distributed this responsibility in a variety of manners. Likewise, attention was directed to the fact that the Congress had utilized both the courts and administrative bodies for law enforcement purposes and that the enforcement procedure of the courts and the administrative agencies are collaborative instrumentalities of justice and not rivals. There, the court held, despite an absence of an explicit provision to that effect, that the review procedure provided for in the Act was the exclusive means of challenging the order and in so holding emphasized that the legislative intent was the controlling factor. Again, we point to the language of the legislation before us providing for first, administrative review, and, second, judicial review before a three-judge court "but not otherwise." "Otherwise" has a well defined meaning.[19] Clinton v. United States, 260 F.2d 824, 825 (9th Cir. 1958).

## II.

Entirely aside from the jurisdictional barrier created by Southern's failure to follow the appellate procedure outlined in 49 U.S.C. § 17(9), the record fails, under proper legal standards to support the lower court's conclusion that the second revised Service Order No. 939 was invalid because, (1) there was no evidence to support its finding of an emergency, and (2) the order was too vague to be enforceable.

Assuming the correctness of Southern's position that it is merely resisting enforcement of administrative action and, thus, entitled to challenge the validity of the revised order, nevertheless, the trial in the district court would not be *de novo*. Motor Freight Express v. United States, 119 F.Supp. 298, 303 (M.D.Pa.1954) (three-judge court), aff'd. 348 U.S. 891, 75 S.Ct. 215, 99 L. Ed. 700 (1954); Lang Transportation Corp. v. United States, 75 F.Supp. 915, 922 (S.D.Cal.1948) (three-judge court). Furthermore, the only questions which could be properly raised would be those affecting the constitutional power, statutory authority and warrant in the record for the Commission's determination, ascribing to the Commission's finding the weight due to judgments of an expert body. Rochester Telephone Corp. v. United States, 307 U.S. 125, 139–140, 59 S.Ct. 754, 83 L.Ed. 1147 (1939). Consequently, the scope of judicial review of the Commission's order would necessarily be extremely narrow. The trial court properly ruled that emergency proceedings can only be invoked to deal with actual emergency circumstances. He then went on to state the box car shortage had been existent over a number of years and that there was no finding of an emergency shortage of 50-foot box cars or wide door 40-foot box cars at the time of the violations alleged in the complaint. He then held there was no actual emergency within the meaning of the legislation when the Second Revised Service Order was promulgated on February 6, 1963. We are here concerned with whether an emergency existed at the time of the issuance of the Second Revised Order, with an expiration date of April 30, 1963, later amended to expire on December 31st of that year. The revised order stated in its preface, (1) that an acute shortage of box cars 50-foot long or longer and box cars 40-foot long or longer, with side openings, 8-foot wide or more existed, and (2) that the then

19. Otherwise. 1. In a different manner; in another way or in other ways; contrarily; * * * 2. In different circumstances; under other, or any other, conditions; * * * 3. In other respects; * * * Webster's International Dictionary, 2d Ed.

present carrier rules and regulations respecting the use, supply, control, movement, distribution, exchange, interchange and return of box cars of the specified dimensions to the railroad owning them were ineffective to cope with the situation, and (3) that notice and public procedure were impracticable and contrary to the public interest and that good cause existed for making the order effective on less than 30 days notice. While it is true that the Board did not state the facts which formed the basis on which the recitations were grounded, there is nothing in the legislation [20] which requires such a statement. The only test for the exercise of this power, as outlined by Congress, was the "opinion" of "the Commission" as to the existence, at the time, of the type of an emergency contemplated by the statute. An emergency consists of a combination of circumstances which calls for immediate action. A three-judge court in Daugherty Lumber Co. v. United States, 141 F.Supp. 576, 580–581 (D.Or.1956), in discussing the issuance by the Commission of a car service order, analyzes the difference between an "emergency" when viewed in a legislative sense and the same word when viewed from the commonplace meaning of an unforeseen combination of circumstances which calls for immediate action.[21] Consequently, the fact that the car shortage may have been of long standing, gives no support to a finding that an emergency did not exist. Of particular interest is the fact that *Daugherty* involved a challenge to a service order of the Commission, somewhat similar in language to the order here under attack.

The only record of the Commission which was before the district court was the service order itself, containing the Board's summary findings, the expression of its opinion as to the existence of the emergency and the order based thereon. It is an established rule that the findings of the Commission may not be challenged on review in the absence of evidence upon which they were made and a complainant may not free itself of this restriction by attempting to introduce additional evidence on the hearing. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Spiller v. Atchison, T. & S. F. Ry. Co., 253 U.S. 117, 125, 40 S.Ct. 466, 64 L.Ed. 810 (1920). Furthermore, the appellant properly invokes the presumption that the Commission properly performed its official function and this presumption gives complete validity to its declaration of an emergency, in the absence of clear evidence to the contrary. Baltimore & O. Ry. Co. v. United States, 298 U.S. 349, 358–359, 56 S.Ct. 797, 80 L.Ed. 1209 (1936). Aside from the above, it is manifest the Congress intended that the opinion of the Commission be controlling in the absence of proof that the opinion was motivated by fraud, wrong-doing or capriciousness. Daugherty Lumber Co. v. United States, supra. The District Court's holding that an emergency could not exist over an extended period of time does not follow the law on the subject. Daugherty Lumber Co. v. United States, supra; Iversen v. United States, 63 F. Supp. 1001 (D.D.C.1946) (three-judge court), aff'd. 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946). A judge is not

---

20. "Whenever the Commission is of the opinion that a shortage of equipment, congestion of traffic, or other emergency requiring immediate action exists in any section of the country, the Commission shall have and is hereby given, authority either upon complaint or upon its own initiative without complaint, at once, if it so orders, without answer or other formal pleading by the interested carrier or carriers, and with or without notice, hearing or other making or filing of a report, according as the Commission may determine. * * *"

21. "Legislative emergencies are those situations where the common good or public interest is legislatively declared to be paramount to individual interests. Common knowledge tells us that legislative action effective immediately, has on legion occasions been adopted to correct an adverse public interest situation of long standing." Daugherty Lumber Co. v. United States, supra, p. 581.

permitted to exchange his judgment for that of the Commission.

Since the record supports the Commission's finding that an emergency existed, it makes it unnecessary for us to discuss the absence of notice or a hearing before the promulgation of the order. The cases cited by Southern, other than United States v. Southern Ry. Co., 250 F.Supp. 759, Civil Action No. 4723 (S.C. Greenville Division) appeal now pending, C.A.4, No. 10796, do not support its theory on the existence of an emergency. In Re Solar Mfg. Corp., 176 F.2d 493 (3d Cir. 1949) dealt with an emergency on the sale of assets under a court order under the Bankruptcy Act, while Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202 (1924) tends to anchor the theory of appellant, rather than that of Southern. Nor does Peoria & P. Union Ry. v. United States, 263 U.S. 528, 44 S.Ct. 194, 68 L.Ed. 427 (1924) lend support to Southern. That decision is confined to a declaration that the emergency powers conferred by Congress on the Commission did not include power to require a terminal carrier to switch by its own engines and over its own tracks freight cars which were tendered by and for another connecting carrier. We have no quarrel with the statement in Chastleton Corp., et al., v. Sinclair, e tal., 264 U.S. 543, 547, 44 S.Ct. 405, 68 L.Ed. 841 (1924), that a law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed. No doubt, the Commission had authority to grant a hearing on such a contention at any time during the existence of the order, and we find nothing in Southern's pleadings which would indicate such a change after the effective date of the order under scrutiny and the terminal date of the penalties sought to be enforced.

The lower court felt that the order was too vague for enforcement.

We agree with the lower court that a statute "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the essentials of due process." He felt that the phrase, "used only for loading" in paragraphs (b) (3)[22] and (4)[23] was so ambiguous and vague that men of common intelligence could differ as to its meaning and application. In explaining his position, he stated, "On the one hand the phrase may be interpreted to mean that the order applies only to shippers, not to carriers (because shippers do the loading), and that even if it does apply to carriers it does not apply to the carrier's act of placing cars for loading or transportation. On the other hand, it not only may be, but is contended that the order applies to carriers and that it applies to their placing cars for loading and transportation."

The language of the order does not support these views. We must keep in mind that Southern, being a common carrier, was familiar with the language used in the field of interstate commerce. The order directed "each common carrier by railroad, subject to the Interstate Commerce Act * * * (2) observe, enforce, and obey [these] rules, regulations and practices with respect to its car service." Southern does not question the fact that the order was intended as a substitute for the then existing, but ineffective carrier rules, regulations and practices with respect to the use, supply, control, movement, distribution, exchange, interchange and return of box cars to the railroads using them, which rules contain precisely the same phrases. Southern, being a party responsible for the promulgation of the carrier's own rules, would be presumed to be familiar with their requirements. There can be

22. "(b) (3) Cars locating in a home district may be used only for loading to a destination on or via owner's rails or to a junction with the owner."

23. "(b) (4) Cars locating in a district adjacent to a home district may be used only for loading to a home district or beyond if routed via the owner."

no question but that the order covered the transportation of loaded cars and the act of placing cars for loading by the carriers. True enough, a shipper may do the actual loading, but it is the duty of the carrier to distribute the cars for loading. The word "loading" is a technical word in the railroad field meaning both the loading of a car, that is the placing of freight in a car, and the transportation of the loaded car. The Association of American Railroads, the agent of Southern and other major lines, in its Code of Car Service Rules-Freight, uses the words "loaded" and "loading" in the following context:

"Foreign empty cars other than those covered in Rule 2, shall be:

(a) *Loaded* to or via owner's rails.

(b) *Loaded* to a destination close to owner's rails than is the *loading* station or delivered empty to a short line or switch *loading* road for such *loading*."

Patently, this rule, authored by Southern's Association, would be without meaning if the word "loaded" or "loading" was restricted to. the placing of freight in a box car. Without question, the meaning of the word "load", as understood by the authors of the Code of Car Service Rules, was the meaning intended to be applied to the railroad's own Special Order No. 103. From the viewpoint of the Association, there was nothing vague or ambiguous in using the phrase in the manner so employed. The fact that Southern by letter to the Interstate Commerce Commission, dated July 5, 1962, stressed the importance of full compliance with the Revised Service Order and indicated an intention to fully comply, if the Commission would force other railways to take the same steps, completely destroys Southern's contention that the challenged phrase was so vague that it could not be understood and is, therefore, void.

The judgment of the lower court is set aside and the cause remanded with directions to allow appellant's motion for a partial summary judgment on the issues herein decided and for such further proceedings as may be proper under the issues raised by the pleadings.