**DELAWARE AND HUDSON RAILWAY COMPANY, 40 Beaver Street, Albany, N. Y., 12207, Plaintiff,**

v.

**CONSOLIDATED RAIL CORPORATION, 1138 Six Penn Center Plaza, Philadelphia, Pa., 19104, Defendant.**

No. 81–CV–1246.

United States District Court, N. D. New York.

Dec. 11, 1981.

George H. Kleinberger, Albany, N. Y., for plaintiff; William P. Quinn, Eric M. Hocky, Fell, Spalding, Goff & Rubin, Philadelphia, Pa., of counsel.

Richard E. Mehley, Philadelphia, Pa., for defendant; Earl H. Gallup, Jr., McNamee, Lochner, Titus & Williams, Albany, N. Y., of counsel.

MEMORANDUM–DECISION and ORDER

MINER, District Judge.

I.

In this action plaintiff seeks an injunction directing the defendant, Consolidated Rail Corporation, to concur in a joint rate applicable to the interline transportation of freight, specifically newsprint, over the rail lines of Canadian National Railways, Conrail and the plaintiff, Delaware and Hudson Railway Company. Federal jurisdiction is asserted under 28 U.S.C. §§ 1332(a)(1) and

(c). Before the Court is plaintiff's motion for a preliminary injunction.[1]

## II.

The dispute arises from the transportation of newsprint and groundwood paper ("newsprint") from a shipper located in Grand Mere, Province of Quebec, Canada to a buyer located in Parkesburg, Pennsylvania. This newsprint is shipped over two alternate routes. It may be shipped via Canadian National Railways (hereinafter "CN"), from Grand Mere to Rouses Point, New York, from there via Delaware and Hudson Ry. Co. (hereinafter "D&H") to Harrisburg, Pennsylvania, and from Harrisburg via Consolidated Rail Corporation (hereinafter "Conrail") to Parkesburg ("Rouses Point Route"). Alternatively, it may be shipped via CN from Grand Mere to Huntingdon, Province of Quebec, and from there via Conrail to Parkesburg ("Huntingdon Route"). Up until November 11, 1981, the cost to a shipper was $2.81 per 100 pounds ("joint rate"), regardless of the route over which the newsprint was shipped.

CN announced its intention to publish a new joint rate of $2.35 per 100 pounds applicable to newsprint. Conrail ultimately refused to concur in the new rate via the Rouses Point Route. However, it concurred via the Huntingdon Route. D&H concurred via the Rouses Point Route. Consequently, CN published and filed with the Interstate Commerce Commission (hereinafter "ICC") a tariff establishing the reduction for the Huntingdon Route, pursuant to 49 U.S.C. § 10762.[2] This rate took effect November 11, 1981.

Initially, Conrail indicated its willingness to concur on the new joint rate on both routes. However, it later rescinded its concurrence for the Rouses Point Route. Negotiations between D&H and Conrail, as to concurrence on the new rate for the Rouses Point Route, have failed to produce an agreement. Therefore, CN did not publish a new rate for shipments via the Rouses Point Route.

D&H asserts that, since there are now two different rates application on the Huntingdon and Rouses Point Routes, it is to the shipper's advantage to seek the least expensive transportation. Shippers have told D&H that the lower rate for newsprint shipped via the Huntingdon Route will make it uneconomical to ship via D&H's Rouses Point Route.

Moreover, D&H claims that it is a party to an agreement with Conrail executed December 19, 1975, which covers, *inter alia*, the maintenance of joint rates and access to these routes. This agreement, D&H asserts, represented a compromise reached between D&H, and other small carriers, with Conrail to prevent Congress from binding Conrail by statute to similar obligations.[3] D&H claims that Conrail's refusal to concur in the joint rate for newsprint shipped via the Rouses Point Route, while concurring in the joint rate via the Huntingdon Route, is a clear breach of this agreement. This breach, D&H claims, will cause traffic to be diverted away from Rouses Point, thus away from D&H, causing irreparable economic harm to D&H.

Conrail asserts that the agreement is merely a broad statement of its obligation

---

**1.** Originally plaintiff sought a temporary restraining Order pursuant to Fed.R.Civ.P. 65(b). By agreement of the parties, this application was converted to a motion for preliminary injunction pursuant to Fed.R.Civ.P. 65(a).

**2.** 49 U.S.C. § 10762(a)(1) provides in part: "A carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall publish and file with the Commission tariffs containing the rates ...." 49 U.S.C. § 10762(b)(2) provides that "[t]he carriers that are parties to a joint tariff, other than the carrier filing it, must file a

concurrence or acceptance of the tariff with the Commission...." Thus a carrier, that is a party to a joint rate, may block the implementation of a new rate by refusing to file an acceptance of the tariff.

**3.** The agreement was entered into just prior to the passage of the Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act"). D&H apparently believes that this, and similar agreements by Conrail, forestalled Congress from implementing protective legislation for small carriers on joint rate routes.

not to engage in discriminatory or unreasonable practices as to its shared route with D&H. There is nothing in this agreement which precludes Conrail from competing with D&H on other non-shared routes. What Conrail may not do is cancel existing joint and through rates with D&H, or act in any manner as to impair D&H service over their joint routes. Conrail claims that in effectuating D&H's interpretation of the agreement, Conrail would be prohibited from effectively competing and attracting traffic.

The threshold question here is whether this Court has jurisdiction to grant relief to prevent breach of a rate contract enjoining a carrier from refusing to file a concurrence of a tariff. Having considered the arguments, briefs and affidavits submitted by counsel for the parties, this Court concludes that, since the Court has no jurisdiction over this matter, the motion for a preliminary injunction should be denied.

### III.

Conrail argues that the ICC has "primary jurisdiction" over the subject matter of this controversy for several reasons.[4] First, determination of whether Conrail has breached the agreement cannot be made until several factors have been resolved by the ICC. The ICC must determine whether the agreement, given the present "regulatory climate", remains binding on the parties. The ICC must also consider whether the several pieces of transportation legislation enacted subsequent to the agreement have rendered many of its obligations null and void. These issues are currently being considered by the ICC.[5] Since determination by the ICC of the status and effect of this agreement must precede any determi-

nation of any breach, this Court, Conrail argues, must yield to the primary jurisdiction of the ICC to provide any remedy based upon the agreement.

Second, Conrail contends that determination of the force and effect of the agreement can only be made by the ICC since a detailed knowledge of the interrelationship of the "3R Act of 1973", the "4R Act of 1976"[6] and the Staggers Rail Act of 1980 ("Staggers Act") is required. Congress has given the ICC the primary responsibility for interpreting and enforcing these laws, and the ICC's special expertise regarding the transportation regulatory scheme is essential to determining whether the agreement is consistent with current transportation law and policy.

Third, Conrail argues that a determination of whether a certain practice constitutes a "commercial closing" and thus destructive competition, as D&H asserts Conrail's action to be, is within the primary jurisdiction of the ICC. Moreover, this Court lacks the authority to implement or concur in a particular rate and thus lacks jurisdiction over this matter.

Finally, Conrail asserts that if the 1975 agreement requires Conrail to maintain rate parity between the Rouses Point Route and the Huntingdon Route, as D&H contends, there would be a violation of both the Interstate Commerce Act and section 1 of the Sherman Act. Section 10706(a)(2)(A) of the Interstate Commerce Act provides that when a rail carrier is a party to an agreement between at least two rail carriers, and the agreement relates to rates, the carrier shall apply to the ICC for approval of that agreement. Since the 1975 agreement has not been submitted to the ICC,[7]

4. The doctrine of primary jurisdiction applies whenever enforcement of a claim in court requires resolution of issues which have been placed within the special competence of an administrative agency. United States v. Western Pacific R.R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

5. Finance Docket 29695, Consolidated Rail Corporation—Petition to Require Cancellation of Agreement with Grand Trunk Western Railroad Company and Detroit, Toledo and Ironton

Railroad Company. It is interesting to note that D&H has intervened in this petition.

6. See F.N. 3 supra.

7. Conrail argued that under the Staggers Act all rate agreements must be submitted to and approved by the ICC in order to assure competition and to provide anti-trust exemption. 49 U.S.C. § 10706.

let alone approved by it, it cannot be construed as a valid agreement to require rate parity, even if that were the intent of the parties.

D&H argues that this Court has not been asked to invoke any powers which are within the primary jurisdiction of the ICC. Citing *Great Northern Railway Company v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922), D&H asserts that when words of a written instrument are used in their ordinary meaning, as here, resort to the ICC is unnecessary to construe and enforce the writing. This is so because the special expertise of the ICC is not needed and construction of a writing is solely a question of law for a court's determination. Moreover, D&H argues that completion of the pending ICC investigation into the validity of similar agreements [8] is not a condition precedent to a resolution of the present proceeding. First, the ICC lacks any authority to abrogate private contracts.[9] Second, the investigation referred to is a challenge to agreements between Conrail and two other carriers. Thus, since D&H believes the ICC is without power to abrogate contracts, even if the ICC holds that it *may* abrogate them, this Court, in the interim, has the power to enforce a valid existing agreement.[10]

## IV.

The dispute presently at issue involves the interpretation of the Interstate Commerce Act and the revision of that Act by the Staggers Act.[11] The Staggers Act represents a major change in the principles and policies behind government regulation of the railroad industry. Prior to the Act, it was the national policy to promulgate and maintain "reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices. . . ." Interstate Commerce Act of 1978, Pub. L. 95–473, § 10101(a)(4), 92 Stat. 1337 (1978) (prior to the 1980 amendment). This policy was to be implemented by "the impartial regulation of the modes of transportation" by the ICC. *Id.* § 10101(a).

Conversely, the Staggers Rail Act of 1980 is designed to deregulate the rail industry. Section 101 of the Act, 49 U.S.C. § 10101(a),[12] directs the ICC to encourage primary reliance on the market place, to limit regulation of the railroad to those areas where there is an absence of effective competition and to permit rates which provide adequate revenues necessary to attract capital investment. Indeed, "[t]he affirmative rail transportation policy under section 10101(a) is intended to ensure the development of a sound rail transportation system by moving the industry toward more aggressive competition, pricing innovation, and adequate revenues . . . [t]he Commission should . . . encourage competition by and within the railroad industry." H.R. Rep.No. 1035, 96th Cong., 2d Sess. 54, *re-*

---

**8.** *See* F.N. 5 *supra.*

**9.** *Cf. City of Palestine, Texas v. United States*, 559 F.2d 408, 414 (5th Cir. 1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1576, 55 L.Ed.2d 800 (1978). (ICC cannot void contracts not germane to the success of a merger).

**10.** D&H cites *Southwestern Electric Power Co. v. Burlington Northern, Inc.*, 475 F.Supp. 510 (E.D.Tex.1979) (*"SWEPCO"*) for the proposition that a court may suspend a new rate for being in violation of a contract. *Contra Hanna Mining Co. v. Escanaba and Lake Superior Railroad Co.*, 498 F.Supp. 1267 (E.D.Mich. 1980). D&H distinguishes *SWEPCO* and *Hanna* in that the present action deals with the publication of a new rate as opposed to the challenge of an existing rate.

**11.** Staggers Rail Act of 1980, Pub. L. 96–448, § 10101(a) *et seq.*, 94 Stat. 1895 (1980).

**12.** 49 U.S.C. § 10101(a)(1)–(3) provides:

In regulating the railroad industry, it is the policy of the United States Government—
(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
(2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;
(3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, as determined by the Interstate Commerce Commission.

*printed in* [1980] U.S.Code Cong. & Ad. News 3978, 3999.

Thus, the public policy behind the Staggers Act is that rates should be established by rail carriers in response to market forces. *See* 49 U.S.C. § 10701a(a). The real question here, then, is whether a rate-fixing agreement between carriers conflicts with the market force-free enterprise policy set by the Staggers Act. This Court believes that Congress has placed the resolution of that issue squarely in the hands of the ICC.[13]

The purpose for granting the ICC "primary jurisdiction" over matters such as this is to ensure a uniform and consistent interpretation of the regulatory scheme governing the railroad industry. *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). This is especially true where, as here, resolution of the issue requires the special competence of an administrative agency in harmonizing enforcement of the agreement with several provisions of the Staggers Act and an older provision of the Interstate Commerce Act.

Section 301 of the Staggers Act, 49 U.S.C. § 10705(a),[14] allows a carrier to apply a surcharge increasing or decreasing ("negative surcharge") the through charge without the concurrence of other parties to the joint rate. D&H's interpretation of the agreement would effectively prevent Conrail from unilaterally publishing a surcharge, on Conrail's competing route, without the concurrence of D&H.[15] However, this provision of the Staggers Act was designed to eliminate the need for both joint carrier and ICC concurrence on rate changes. "The Committee believes that

this section provides necessary relief to rail carriers presently required to carry freight under inadequate joint rates .... [moreover], [t]he Committee believes that if the railroads are given freedom to set rates in a competitive market place, they should not be allowed to continue collective ratemaking ..." H.R.Rep.No. 1035, 96th Cong., 2d Sess. 42, *reprinted in* [1980] U.S.Code Cong. & Ad.News 3987.

The manner in which the statute, the agreement and § 10762 coexist is an issue primarily within the competence of the ICC. The statutory provisions and the agreement seem to be in discord. Section 10762,[16] originally promulgated in 1887, provides for the publishing of joint rates, with changes of rates to be approved with the consent of all carriers privy to the joint rate. The agreement, construing it in a manner consistent with D&H's interpretation, provides that Conrail must consent to lower the rate on the Rouses Point Route. Section 10705 allows the unilateral reduction, or even cancellation, of a through charge on a joint route. It is clear that the interplay of these provisions and the agreement involves interpretation of complex issues pertaining to a convoluted regulatory scheme, a scheme that Congress intended the ICC to have at least the initial responsibility for interpreting.

Moreover, injunctive enforcement of the agreement is in reality an attack, through the back door, on the Huntingdon Route rate. D&H is in essence attacking that rate as unreasonable, discriminatory, and as the cause of a "commercial closing." Clearly, resort to the ICC in this type of a situation is mandated. "Whenever a rate, rule or practice is attacked as unreasonable or as

---

**13.** The argument for judicial restraint is buttressed by the fact that similar agreements are pending before the ICC for interpretation. *See* F.N. 5 *supra.*

**14.** Section 10705(a) provides in part:
[A] rail carrier ... may publish and apply a surcharge increasing or decreasing the through charge applicable to any movement between points designated by the surcharg-

ing carrier subject to a joint rate. Such a surcharge may be applied without the concurrence of the other carriers that are party in such joint rate.

**15.** This interpretation represents an example of a possible conflict between the Staggers Act and the agreement between the parties.

**16.** *See* F.N. 2 *supra.*

unjustly discriminatory, there must be preliminary resort to the Commission." *Great Northern Railway Co. v. Merchants Elevator Co.*, 259 U.S. 285, 293, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1923). *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 69, 77 S.Ct. 161, 167, 1 L.Ed.2d 126 (1956); *Illinois Central Gulf R. Co. v. Tabor Grain Co.*, 448 F.Supp. 110 (N.D.Ill.1980). Indeed, the Supreme Court has, in the past, looked askance on district court injunctive interference in the bailiwick of the ICC. *Arrow Transportation Co. v. Southern Railway Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). *See Consolidated Rail Corporation v. National Association of Recycling Industries*, 449 U.S. 609, 612, 101 S.Ct. 775, 777, 66 L.Ed.2d 776 (1981).

D&H cites *Southwestern Electric Co. v. Burlington Northern, Inc.*, 475 F.Supp. 510 (E.D.Tex.1979), as authority supporting the proposition that a federal court may suspend a new rate for being established in violation of a contract. However, even assuming, *arguendo*, that the holding of *SWEPCO* applies here, this decision was rendered a full year before the passage of the Staggers Act. Moreover, the agreement in *SWEPCO* involved a contract between a carrier and a shipper. This type of an agreement is clearly in harmony with the marketplace deregulating philosophy of the Staggers Act.[17] Indeed, section 208(a)(i)(2), 49 U.S.C. § 10713(i)(2), of the Act explicitly provides for judicial review of this type of an agreement. *Cleveland-Cliffs Iron Co. v. Chicago & North Western Transportation Co.*, 516 F.Supp. 399, 403 (W.D.Mich.1981). Here we have a very different type of an agreement—an agreement between two carriers.

Conrail argues that 49 U.S.C. § 10706 precludes judicial review of the agreement. Section 10706 provides in part that "[a] rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission . . . that is a party to an agreement of at least 2 rail carriers . . . shall apply to the Commission for approval of this agreement under this subsection." The Commission shall approve the agreement if it finds that the making and carrying out of the agreement will further the transportation policy of § 10101a of the Staggers Act. If the ICC makes this finding, the parties are exempt from the applicable anti-trust laws. 49 U.S.C. § 10706(a)(2)(A). On its face this provision seems to be dispositive of the matter of initial judicial review of a carrier rate fixing agreement.

Collective ratemaking, the practice of carriers establishing uniform rates, was a custom long followed and not prohibited by the Interstate Commerce Act. In the mid-1940's the Supreme Court held that this practice violated the anti-trust laws.[18] As a result of the Court's holding, Congress passed the Reed-Bullwinkle Act (June 17, 1948). Reed-Bullwinkle added section 5b to the Interstate Commerce Act. This section placed a duty upon the Commission, on its own motion or upon application of the carriers, to approve agreements between carriers with a grant of anti-trust immunity, if it finds the agreements to be in the furtherance of the national transportation policy. This is the "rate bureau" provision. In the "4R Act" of 1976, permissible rate bureau activity was narrowed. Railroads were *required* to apply for approval of rate bureau agreements. The Commission was given broad authority to investigate and review such agreements. Section 302 of the Staggers Act, 49 U.S.C. § 10706, placed new limitations on rate bureaus. Basically, only a carrier that "practically participates in the movement" may vote on the setting of a joint rate. H.R.Rep.No. 1035, 96th Cong., 2d Sess. 66, *reprinted in* [1980] U.S.Code Cong. & Ad.News 4010.

A review of the above applicable legislative history clearly reveals that § 10706 of the Act involves rate bureaus. A rate bureau is an association in which railroads set

---

17. This type of agreement is analogous to a contract of a sale of services to a consumer.

18. See *McLean Trucking Co. v. United States*, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944).

uniform rates for a geographical area. Here, as the agreement does not establish a bureau, the agreement does not have to be submitted to the ICC under this particular provision. Section 10706 is not dispositive of the Conrail-D&H agreements. *See Akron, Canton & Youngstown R. Co. v. United States*, 586 F.2d 29 (7th Cir. 1978).

However, Congress has given the ICC primary responsibility for interpreting and enforcing railroad regulatory law and policy. The Commission's knowledge and expertise regarding the transportation regulatory scheme is essential to determining whether the agreement is consistent with present transportation law and policy. The ICC, because of its special function of interpreting and applying these transportation laws, is the body equipped to decide the status of the agreement in issue. *Indiana Harbor Belt Railroad Co. v. United States*, 510 F.2d 644 (7th Cir. 1975); *United States v. Southern Railway Co.*, 364 F.2d 86, 91 (5th Cir. 1966). In areas where Congress has delegated authority to an administrative body to determine arcane areas of regulatory law, the courts should defer to the will of Congress. D&H's relief is through the ICC.[19]

D&H's motion for preliminary injunction is hereby denied.

It is so Ordered.

---

**19.** In any event, D&H has failed to make a showing of irreparable harm. Section 10705(a) is available to D&H. D&H may publish a negative surcharge on the Rouses Point Route. Although this will not bring the rate on the Rouses Point Route to parity with the rate on the Huntingdon Route, it will provide for an increase in revenues for D&H. (Oral arguments of D&H on hearing for Preliminary Injunction, December 4, 1981).